## COMMISSIONER OF INTERNAL REVENUE v. UNITED STATES & INTERNATIONAL SECURITIES CORPORATON.

## UNITED STATES & INTERNATIONAL SECURITIES CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.

### Nos. 7902, 7903.

Circuit Court of Appeals, Third Circuit.

Argued March 20, 1942.

Decided Sept. 24, 1942.

Rehearing Granted Oct. 30, 1942.

John P. Ohl, of New York City (Wright, Gordon, Zachry, Parlin & Cahill, Samuel A. McCain and John A. Reed, all of New York City, on the brief), for taxpayer.

Louise Foster, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch, and A. F. Prescott, Sp. Assts. to Atty. Gen., on the brief), for the Commissioner.

Before BIGGS, MARIS, and JONES, Circuit Judges.

BIGGS, Circuit Judge.

In 1928 Berliner Stadische Elektrizitatswerke Aktiengesellschaft, Berlin Electric, arranged for a loan of 12,600,000 reichsmarks, the equivalent of about $3,000,000. The company gave its note, bearing interest at 8% to Siemens-Schuckertwerke Aktiengesellschaft for 12,600,000 reichsmarks. By its terms the note was payable in six semi-annual installments of 2,100,000 reichsmarks each, beginning on July 1, 1932, and ending upon January 1, 1935. Siemens assigned this note to Dillon, Read & Company. Siemens then gave its note, dated the same day as that of Berlin Electric and bearing interest at the same rate, payable also in six semi-annual installments in dollars approximately equivalent to the semi-annual installments due on the Berlin Electric note, to Dillon. The understanding was that Siemens' dollar obligation was to be enforced to the extent, but only to the extent, that Berlin Electric defaulted on its obligation or to the extent that Berlin Electric's obligation on its note could not be converted into the number of dollars called for by Siemens' obligation.

Dillon placed the loan with various participants and the taxpayer, United States & International Securities Corporation participated to the extent of 2,605,000 reichsmarks in principal amount and $620,000 principal amount of the Siemens' note. Dillon charged the taxpayer's account with $620,964.43 on November 22, 1928, $620,000 representing the principal amount of the loan and $964.43 representing the accrued interest thereon. The cost to the taxpayer of its participation in each of the six installments to be paid by Berlin Electric or Siemens was $103,333.33. Both of the original notes were held by Deutsche Kreditsicherung, as trustee. The trustee issued a certificate stating the circumstances under which the loan was made and the obligations of the parties to each participant in the loan and Dillon received such a certificate for the taxpayer.

Berlin Electric paid the semi-annual installments which came due on July 1, 1932, January 1, 1933, and July 1, 1933. But before the installment of January 1, 1934, became due the United States went off the gold standard and a dispute arose between the parties. The gold equivalence of the dollar was reduced.[1] Under the German law, if the obligation was a dollar obligation only that number of marks would have to have been paid by Berlin Electric or Siemens which would satisfy the reduced gold content of the dollar. If, on the other hand, the obligation was deemed to be an obligation payable in marks, it followed that Berlin Electric and Siemens would have to deliver the number of marks called for by the Berlin Electric note. It was cheaper for the obligors to take the former view. Dillon asserted the latter. Berlin Electric paid the respective installments due on January 1, 1934, and July 1, 1934, at the rate most favorable to it, paying against each installment due upon the dates stated 259,883.32 marks. Upon the installment due upon January 1, 1935 it paid 259,366.68 marks. The taxpayer converted these marks and received against the three payments the three following sums in dollars: $59,072.12, $48,107, and $48,975.94. In its 1934 re-

---

[1] "Gold Reserve Act of 1934", 48 Stat. 337, 342, 31 U.S.C.A. § 821. See 48 Stat. 1730, 31 U.S.C.A. § 821 note.

turn it deducted a total loss of $99,487.54, and in its 1935 return a loss of $54,357.40, these sums representing the difference between the dollars due to be received by it against the three installments of $103,333.33 each and the dollars actually received in payment of those installments. It set up upon its books against the additional marks claimed by it against the three installments "relative fair values for purposes of allocation" and "allocated cost basis" of zero. For the year 1935 the loss deduction of $54,357.40 claimed by the petitioner was off-set in its full amount against taxable income. But for the year 1934 the taxpayer's deduction of $99,487.54 could only be off-set to the extent of $38,929.10 because the taxpayer sustained a net loss in that year of $60,588.44. In other words, the taxpayer did not have income against which to off-set the full loss claimed by it in the year 1934, but could off-set only to the extent of $38,929.10. At that particular point in time, assuming that nothing more had occurred and the transactions upon the obligations of Berlin Electric and Siemens had come to an end, the taxpayer would have had an unrecouped loss of $60,558.44. It happened, however, that the dispute between Berlin Electric and Dillon was arbitrated. The result was that Berlin Electric agreed to pay and did pay 60% of the number of reichsmarks claimed by Dillon and the Berlin Electric and Siemens notes were thereupon cancelled. This occurred in 1937. As its share in this settlement the taxpayer received 338,655.50 reichsmarks on account of the principal installments which had become due in 1934 and 1935. It converted the marks into dollars and received, net, $33,548.48. On its 1937 return the taxpayer reported this sum as capital gain. The Commissioner concluded that it was ordinary income and as a result thereof assessed a deficiency against the taxpayer in the sum of $9,382.45. The taxpayer appealed to the Board of Tax Appeals and claimed that its transactions with Berlin Electric and Siemens were not closed until 1937, and that a loss of $120,296.46 was ascertained and charged off by the taxpayer within the year 1937 and that as a result thereof the taxpayer overpaid its income tax for the year 1937 in the sum of $33,900.58.

The Board of Tax Appeals decided that since the taxpayer showed an unrecouped net loss of $60,558.44 on its return for the year 1934 which it was not able to off-set in that year against taxable income and inasmuch as this sum exceeded the amount of $33,548.48 realized in 1937 on its settlement with Berlin Electric and Siemens, it might in effect off-set the $33,548.48 against the unrecouped net loss of $60,558.44 and that therefore no part of the sum recovered in 1937 was taxable to the taxpayer. Before the Board the taxpayer had claimed that the series of transactions which we have heretofore referred to amounted to but one transaction; that is to say, in 1928 the taxpayer participated in an arrangement whereby the taxpayer purchased a capital asset and this purchase was closed in 1937 resulting in a loss to the taxpayer of $120,296.46. The Board held that the taxpayer could not be sustained in this claim and that it had not sustained the burden of establishing that its transactions in 1934 and 1935 whereby it achieved offsettable losses were not closed transactions. The Board also ruled that an issue of estoppel raised by the Commissioner against the taxpayer was moot.

Both the Commissioner and the taxpayer have appealed. The Commissioner contends that the sum of $33,548.48 received by the taxpayer in 1937 must be held to be ordinary income, taxable as such, with a resulting deficiency in the sum paid by the taxpayer. The taxpayer contends that the transaction between it and Berlin Electric and Siemens was but one transaction whereby it sustained a loss of $120,296.46 which was deductible for the year 1937 and that by reason of this it has overpaid its tax.

The taxpayer's contention really boils down to this, that its treasurer never saw either the Berlin Electric or Siemens notes or the accompanying agreements and that this officer erroneously treated the obligation which was due through Dillon to the taxpayer as if the taxpayer had a participation in six "notes". The taxpayer's treasurer set the obligation up upon its books as follows, "Participation in six notes dated 11–15–28 and maturing in six month periods * * *". This was erroneous, but the fact remains that it was done. Obviously, if the taxpayer had not taken the deductions in the years 1934 and 1935 even though its treasurer had had marked upon its books capital losses for those years, it would have been at liberty to have treated the transaction as closed in 1937, as it actually was, and would have been entitled to claim a capital loss of $120,296.46 in that year.

The Board held that the taxpayer had not sustained the burden of establishing that its participation in the Berlin Electric—Siemens notes had not been closed for tax purposes in 1934 and 1935 when it wrote the unpaid portions of its participation down to zero and took credits against its taxes in those years. The taxpayer by statute was given the option of treating the German obligations as a loss in those years or of waiting until in fact its chances of recovery upon these installments of the notes had been definitely ascertained; that is to say, of waiting until 1937. It actually elected to take the losses in 1934 and 1935, and even if it did so as a result of a mistake of fact there is ample evidence to support the Board's conclusion that the deductions could be taken properly in 1934 and 1935.

We think that it makes little difference whether the taxpayer treated its losses in 1934 and 1935 as capital losses or as bad debts. The case at bar is ruled none the less by the decision of the Supreme Court in Burnet v. Sanford & Brooks Co., 282 U. S. 359, 51 S.Ct. 150, 75 L.Ed. 383. The words of Mr. Justice Stone in the Burnet case, 282 U.S. at page 363, 51 S.Ct. at page 151, 75 L.Ed. 383, are clearly applicable under the circumstances of the case at bar: "All the revenue acts which have been enacted since the adoption of the Sixteenth Amendment have uniformly assessed the tax on the basis of annual returns showing the net result of all the taxpayer's transactions during a fixed accounting period, either the calender year, or, at the option of the taxpayer, the particular fiscal year which he may adopt. Under sections 230, 232 and 234(a) of the Revenue Act of 1918, 40 Stat. 1057, respondent was subject to tax upon its annual net income, arrived at by deducting from gross income for each taxable year all the ordinary and necessary expenses paid during that year in carrying on any trade or business, interest and taxes paid, and losses sustained, during the year. By sections 233(a) and 213(a) gross income 'includes * * * income derived from * * * businesses * * * or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever.' The amount of all such items is required to be included in the gross income for the taxable year in which received by the taxpayer, * * *." See also J. E. Riley, Inv. Co. v. Commissioner, 311 U.S. 55, 61

S.Ct. 95, 85 L.Ed. 36, and Scaife Co. v. Commissioner, 314 U.S. 459, 62 S.Ct. 338, 86 L.Ed. 339.

Section 22 of the Revenue Act of 1936, 49 Stat. 1648, 1657, 26 U.S.C.A. Int.Rev. Acts page 825, applicable in the case at bar, provides that " 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *"

Article 42—1 of Treasury Regulations 94, promulgated under the Revenue Act of 1936, provides, "Bad debts or accounts charged off subsequent to March 1, 1913, because of the fact that they were determined to be worthless, which are subsequently recovered, whether or not by suit, constitute income for the year in which recovered, regardless of the date when the amounts were charged off."

█ The taxpayer's participation in the German obligations represented nothing more than an account due the taxpayer. The analogy of the circumstances of the case at bar to those of the Burnet case is very plain.

It follows that the decision of the Board was erroneous in excluding the sum of $33,548.48 from the taxpayer's gross income for 1937. It is interesting to note that the Board's original view on this question corresponded to that which we have expressed. See Lake View Trust & Savings Bank v. Commissioner, 27 B.T.A. 290. The weight of authority, following the Burnet case is in accord. See Stearns Coal & Lumber Co. v. Glenn, D.C., 42 F. Supp. 28, and the recent decision of the Circuit Court of Appeals for the Fourth Circuit in Helvering v. State-Planters Bank & Trust Company, 130 F.2d 44.

█ In view of what we have said it is clear the taxpayer cannot prevail upon its cross-appeal and deduct as a loss for the year 1937 the sum of $120,296.46 finally sustained by it on the Berlin Electric—Siemens obligations. The decision of the Board in this respect will be affirmed.

The issue of "estoppel" raised by the Commissioner requires brief discussion. The taxpayer contends that it has not had its day in court on this question. The facts relating to it are as follows:

At the beginning of the hearing before the Board counsel for the Commissioner indicated that the Commissioner would plead an estoppel against the taxpayer insofar as the years 1934 and 1935 were concerned and took the position that the taxpayer was estopped to make any change in the result of those returns. The Commissioner's counsel stated that the issue of estoppel was not raised by pleading but that he proposed to amend the pleadings in order to include that issue. He moved the Board orally for permission to amend the answer filed by the Commissioner. The Board Member stated that he desired that the motion be formally filed and counsel for the taxpayer indicated that they had no objection to allowing the respondent to amend the pleadings, stating, " * * but in case the motion is granted we would like to have an adjournment to let him draw up the motion so we can examine what facts he is going to allege that constitute an estoppel". Counsel for the Commissioner then indicated that he would put the evidence in and that he would raise the issue of estoppel when the evidence was in, that it would then be perfectly apparent what the motion was based on. The learned Member indicated that he understood counsel to mean that when the record was completed the Commissioner would amend his pleadings to conform with the proof. Counsel for the Commissioner stated that he thought that the taxpayer's own pleading would permit him to raise the question of estoppel because the taxpayer's petition would be changed "from what the evidence indicates that will be put into the record". The Commissioner's counsel then decided that his motion was premature and it was withdrawn. The hearing was then proceeded with and continued throughout the day. The hearing was closed. The taxpayer filed its requests for findings of fact and its brief on December 20, 1940. On January 29, 1941, the Commissioner filed two motions apparently without notice to the taxpayer, one for leave to file its answering brief out of time and the other for leave to file an amended answer. The Board entered an order, apparently ex parte, permitting the Commissioner to file an amended answer setting up the defense of estoppel.

The Board decided that the issue of estoppel was moot. The confusion which has arisen in respect to an "estoppel" in the case at bar has arisen by reason of the inaccurate way in which the word has been used. The "estoppel" which the Commissioner asserted and finally pleaded against the taxpayer is nothing more than the assertion of the fact that the taxpayer took its losses in 1934 and 1935 and therefore cannot now assert a contrary position in respect to its 1937 tax. The pertinent facts were before the Board for they had already been fully pleaded and argued by the parties. The Board adjudicated the issues raised by these facts and for either party to assert them again now under the guise of an estoppel is futile. The Board held the issue "moot". In fact there was no issue of estoppel at all.

In respect to the alleged issue of "estoppel" the taxpayer asserts that the Commissioner might claim the benefit of the provisions of Section 3801 of the Internal Revenue Code, 53 Stat. 471, 26 U.S.C.A. Int.Rev.Code, § 3801, if it was permitted to review its decision that the 1934 and 1935 installments of the Berlin Electric—Siemens obligations were worthless; that by the provisions of the section, after the final determination of this cause in the taxpayer's favor, the Commissioner would be free, despite any statutes of limitation to recompute and collect the taxes which would then become due from the taxpayer for the years 1934 and 1935. That this is a correct interpretation of Section 3801 is clear. See pp. 48-52 of the report of the Committee on Finance of the Senate, Senate Report 1567, 75th Cong., 3rd Session. But, as has already been pointed out, the taxpayer has not sustained the burden of establishing that it did not properly write off as worthless the installments of the Berlin Electric—Siemens obligations which came due in 1934 and 1935. Congress did not intend by passing Section 3801 to revise the interpretation of the revenue law laid down by the Supreme Court in Burnet v. Sanford & Brooks Co., supra.

The cause will be remanded to the Board for further proceedings in accordance with this opinion.