**ALLIED CHEMICAL CORPORATION**
v.
**The UNITED STATES.**
No. 347–56.

United States Court of Claims.
July 18, 1962.

Rehearing Denied Oct. 3, 1962.

434

Joseph D. Becker, New York City, for plaintiff. Lawrence A. Coleman, New York City, was on the briefs.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the brief.

WHITAKER, Judge.

Plaintiff sues for a refund of excess profits and income taxes paid for the years 1945, 1946 and 1947. Two issues presented are: first, whether attorneys' fees paid in 1945, 1946 and 1947, in opposing certain proceedings brought by the Securities and Exchange Commission (hereinafter, S.E.C.) were deductible as "ordinary and necessary expenses in carrying on a trade or business", or as capital expenditures incurred in the realization of a capital gain; and second, whether a loss incurred in 1946 on certain notes and participation certificates is deductible as a bad debt, or as worthless securities held as capital assets.

The case is before us on plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment. The material facts have been stipulated. Those relevant to the first issue are as follows:

The plaintiff, hereinafter referred to as "Allied", is a New York corporation whose principal function, prior to 1941, was the holding of securities of wholly-owned subsidiaries that were engaged in the business of manufacturing, processing, and selling chemical and related products. In 1941 and 1947 these subsidiaries were merged into Allied and continued their operations as divisions of Allied.

In addition to its chemical business, for the years prior to 1940 and through the 1940–1950 period, Allied also held various corporate and government securities, including stock of American Light and Traction Company, Virginia-Carolina Chemical Corporation, Interlake Iron Corporation, Libbey-Owens-Ford Glass Company, United States Steel Corporation, Air Reduction Company, American Viscose Corporation, and bonds of the United States Government. It is

with the stock of American Light and Traction Company (hereinafter, American) that we are concerned. The total cost of all these stocks was 78.2 million dollars.

In 1925–1929 Allied, in carrying on its business, acquired 234,912 shares of the preferred stock of American (44 percent of the preferred outstanding), at a cost of $7,098,620.81, and 119,200 shares of American common stock (4 percent of the common stock outstanding) at a cost of $5,134,308.25. These combined holdings gave Allied 10.7 percent of the voting power in American. The preferred was non-callable with a par value of $25 per share. American's charter provided that, in the event of any liquidation or dissolution or winding up, whether voluntary or involuntary, the holders of preferred would be entitled to par plus accrued dividends. In the 1930–1945 period, a dividend of $1.50 per share was paid annually on American's preferred. Thus, Allied's interest in American's preferred produced a $5,285,520 income for this fifteen-year period.

American, a public utility holding company whose subsidiaries engaged in the production and marketing of electricity and gas, was itself a "grandson" subsidiary in a public utility holding company system. Its parent was United Light and Railways Company (hereinafter, Railways), and its grandparent, standing at the apex of the system, was United Light and Power Company (hereinafter, Power). Railways owned 51 percent of the voting stock of American. Power, with its 100 percent ownership of Railways, held indirect voting control of American.

In 1940, the Securities and Exchange Commission, acting under section 11(b) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k(b), began proceedings against Power, Railways, and their subsidiaries to bring about a simplification of their corporate structure. In view of Allied's interest in American, the S.E.C. granted Allied leave to intervene in the proceedings in order to be "heard with respect to all matters affecting its interest in American Light & Traction Company." Allied retained a New York law firm for this purpose.

In March, 1941, the S.E.C. ordered the dissolution of Power, the top company of the system, in compliance with the requirement in the Act that a holding company system be limited to a maximum of three tiers of companies. In August, 1941, the S.E.C. ordered Railways to dispose of its interests in the subsidiaries of American and that American dispose of certain of its properties so as to create a "single integrated" public-utility system. The S.E.C. further ordered that the respondents make application to the S.E.C. for the entry of appropriate additional orders to effect the ordered integration. In the proceedings which followed, Allied's counsel urged that S.E.C. direct Power and Railways to divest themselves of their interests in American, pointing out that American had at one time existed independently and that its assets were such to permit it with facility to comply with the integration requirements of section 11(b) (1) and that its holdings thereafter would not impair the advantages of localized management, efficient operation or the effectiveness of regulation.

Between 1941 and 1944 the proceedings were inactive. On November 1, 1944, Railways and American filed "Application 21" with the S.E.C., containing a plan which purported to comply with the 1941 integration order. In essence, it called for the dissolution and liquidation of American, to be accomplished, in part, by payment to the preferred shareholders of an amount equal to the par value of the stock outstanding, plus accrued dividends. At the hearings on Application 21, Allied's counsel opposed the application on the grounds that: (1) the Plan was an attempt to use section 11 to oust the preferred stockholders from the enterprise for the purpose of enriching the common stock; (2) the Plan was unfair because it did not afford the preferred stockholders the legitimate investment value of their stock; (3) the

Plan was not necessary to comply with the S.E.C. orders or the terms of the Act.

In March, 1945, the S.E.C. issued a "Statement of Tentative Views" containing eight tentative conclusions relating to procedure for giving effect to the August 1941 order. The principal conclusion, so far as the question before us is concerned, was that American must be liquidated and dissolved.

In its answer, Allied agreed with some of the views of the S.E.C., but its principal contentions were in opposition to the dissolution of American.

On June 2, 1945, the S.E.C. issued a Memorandum Opinion, reported at 19 S.E.C. 366. It again concluded that American should be dissolved by a series of steps, including the redemption of the preferred stock. Accordingly, when hearings were held in September-November, 1945, to consider the precise provisions of a plan that would accord with the Memorandum Opinion, Allied introduced witnesses only on the value of the preferred stock. These witnesses testified that the fair investment value of American's preferred stock was $39–40 per share—not the $25 per share par value. Likewise, in a brief filed by Allied the following December, it urged that if American's preferred stock were to be liquidated, the fair investment value —not the par value—should be paid on liquidation, which the evidence demonstrated to be $39–40 a share.

On April 30, 1946, there was issued "Findings and Opinion of the Commission," wherein the S.E.C. rejected Allied's contention that dissolution of American was unnecessary. The opinion discussed the testimony of Allied's experts and concluded that $33 per share for the preferred stock would be fair and equitable. No order was entered, pending amendment of Application 21 to accord with the opinion. Then, because of changes in the membership of the S.E.C., re-argument was ordered, on the question of the amount to be paid for the preferred stock, with Allied's counsel participating.

At the same time, in an ancillary proceeding, Allied opposed an application by American seeking approval of its proposal to invest substantially in a pipeline construction company. Allied contended that it was improper to invest assets of American in a speculative pipeline project when the question of the possible dissolution of American had not yet been determined.

No further development occurred until June 26, 1947, at which time Railways and American filed a new plan, Application 31, calling for continuation of American without change in its capital structure, in order for it to participate in a pipeline construction project as the top company in an integrated holding company system. In response to this, Allied filed a petition with the S.E.C. requesting that all proceedings respecting Application 31 be stayed, that the S.E.C. obtain court orders bringing American into compliance with the Act, and that it rehear and determine the issue regarding the fair investment value of the preferred stock in American.

The S.E.C. denied Allied's prayer for a stay, and ordered that the hearings proceed on Application 31. Railways and American then filed an amendment to the Application providing for the purchase by American at $33 per share plus accrued dividends of all shares of preferred stock of American tendered to it for sale at such price, but conditioned on final approval by the S.E.C. and final judicial approval of the pipeline construction project. Allied opposed this amendment, arguing that the S.E.C. had already passed adversely upon the considerations therein presented, that the proposed pipeline project was unnecessary, that it was unfair to preferred stockholders, since an offer of $33, made on the assumption that American would be a continuing rather than a dissolved enterprise, was inadequate, and that Application 31 presented no true alternative.

On December 30, 1947, the S.E.C. approved Application 31, 27 S.E.C. 441,

holding the $33 liquidation offer fair. In November, 1948, American offered, and Allied accepted, terms for the liquidation of the preferred stock in accordance with the provisions of Application 31 as amended. Allied tendered the preferred and received $7,758,947.49. A profit of $660,326.68 was reported in 1948 as capital gain on Allied's federal income tax return.

By reason of Allied's participation in the above-described proceedings, it incurred litigation expenses over the 1940–1948 period totaling $329,329, and in each year of this period Allied accrued on its books and deducted as a business expense the part attributable to the particular year. In 1945 Allied deducted $127,781.27; in 1946, $27,284.14; in 1947, $103,529.81. All of the deductions, except for these three years, were allowed.

■ The issue presented by these facts is whether taxpayer's litigation expenses were deductible from ordinary income, as taxpayer contends, or whether they were capital expenditures which offset capital gain realized on the sale of taxpayer's stock in American, as the Government contends.

The Internal Revenue Code of 1939 (26 U.S.C.) provides in pertinent part:

"§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions:

"(a) Expenses.

"(1) Trade or business expenses.

"(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *.

"§ 24. Items not deductible.

"(a) General rule. In computing net income, no deduction shall in any case be allowed in respect of—

* * * * * *

"(2) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate, * * *."

We are of the opinion that these attorneys' fees were ordinary and necessary expenses in carrying on the taxpayer's business.

As the foregoing recitation of facts shows, plaintiff's principal function from the time of its incorporation until 1941 was the holding of stock in wholly-owned subsidiaries engaged in the chemical business. In addition, however, it had very large holdings of stocks in companies other than those engaged in the chemical business. Its total investment in such stocks amounted to 78.2 million dollars. It held 234,912 shares of the preferred stock of American, at a cost of $7,098,620.81, and 119,200 shares of its common, at a cost of $5,134,308.25.

The parties have agreed that the acquisition of the stock in American was a part of Allied's business, which at that time was confined to the holding of stocks in other companies. What does the business of a holding company consist of? Briefly stated, it consists of conserving and protecting its holdings, influencing, or directing when it can, the management of the companies in which it holds stock, so as to increase the value of its holdings and the income to be derived therefrom, the collection of dividends, the advantageous disposition of stocks in companies with whose management it is not satisfied; or where it appears desirable to do so, and reinvesting the proceeds, etc.

In 1941 plaintiff acquired the assets of its subsidiary chemical companies and operated them as branches, but its business with relation to its stockholdings in American and the other companies listed above remained the same, to wit, protecting and preserving and enhancing the value of its investment and the realization of as much income therefrom as possible.

So, when the Securities and Exchange Commission in 1940 began proceedings

to reorganize the utility holding companies forming the system of which American was a part, so as to bring them into conformity with the Public Utility Holding Company Act of 1935, 15 U.S. C.A. § 79 et seq., Allied, quite properly, thought it necessary for it to intervene in the proceedings. In August 1941 the S.E.C. ordered Railways, American's parent, to dispose of its interest in American's subsidiaries and for American to dispose of certain of its properties.

It can hardly be denied that the taxpayer's participation in these proceedings was a part of its business of protecting and conserving its considerable holdings in American.

The S.E.C. directed Railways and American to propose a plan to carry into effect its objective of creating a "single integrated" public utility system. They came in with a proposal, known as "Application 21", which provided for the dissolution of American. The first step in this proposed dissolution was the redemption of its preferred stock at $25 a share, plus accrued dividends. The taxpayer had paid in excess of $30 a share for its stock, so that the adoption of this proposal would have resulted in a loss to it of $5 a share, despite the fact that it insisted its stock was in fact worth more than it had paid for it. Consequently, in order to conserve its investment, it opposed the proposed dissolution of American.

In March, 1945, the S.E.C. issued a "Statement of Tentative Views", in which it advanced the idea that American should be dissolved. The taxpayer resisted the dissolution.

Up to this point, at least, it must be conceded that the expenses incurred by the taxpayer were in carrying on its business of protecting and conserving its investment. It did not want to dispose of its stockholdings in American. It wanted to keep them as they were. The expenses were not incurred in order to dispose of its holdings at a profit.

Then, on June 2, 1945, the S.E.C. issued what is called a Memorandum Opinion, but which seems to have been of a dignity to warrant its publication in 19 S.E.C. 366. It again concluded that American must be dissolved, in the process of which the preferred stock should be redeemed.

Hearings were held in the latter part of the year on the value of the preferred stock, of which Allied owned 44 percent. Allied, of course, participated in these hearings and put on proof in support of its claim that the stock was worth from $39 to $40 a share.

When the S.E.C. filed its "Findings and Opinion" on April 30, 1946, it rejected the taxpayer's contention that American should not be dissolved, but found that the preferred stock was worth $33 a share, instead of the $25 offered.

In the interim the taxpayer appeared in opposition to a petition of American for permission to invest a substantial sum of money in a speculative pipeline project. Allied opposed this as an unwise investment, and further objected to any new venture until the matter of dissolution was finally determined.

It would appear that taxpayer's participation in this proceeding also was directed toward conserving its investment.

No action was taken by S.E.C. on American's application to invest in this pipeline venture prior to June 26, 1947, at which time American filed Application 31. In it American proposed that S.E.C. allow it to continue as then constituted, without redemption of its preferred stock, and that it be permitted to invest in the pipeline venture. Allied continued to oppose the pipeline venture, and, apparently because of its opposition to it, it abandoned its effort to prevent dissolution of American, and asked the S.E.C. to obtain a court order to bring American into compliance with the Public Utility Holding Company Act.

American then amended its Application 31 to provide for the redemption of the preferred stock at $33 a share, conditioned upon approval of the pipeline venture. On December 30, 1947, the S.E.C. approved Application 31. Then in November 1948 American offered Allied $33 a share for its preferred stock, and the offer was accepted. Later, Allied also disposed of its common stock in American.

Allied realized a profit of $660,326.68 on the redemption of its preferred stock, which it reported as a capital gain.

In the course of its opposition to the dissolution proceedings, beginning in 1940, and until after it disposed of its preferred stock in November 1948, the taxpayer paid out a total of $329,329 for litigation expenses. In the years in question it spent $127,781.27 in 1945; $27,284.14 in 1946; and $103,529.81 in 1947.

For some reason, for which no explanation is offered, these expenses were allowed for all years before 1945 and after 1947, but not for 1945, 1946 and 1947. We think all of them, for each of the years 1940 to 1948, are in the same category. They are all of the same nature. We think they were all spent for the primary purpose of preventing the dissolution of American, and thus preserving intact plaintiff's holdings in that company, and that its subsequent sale of its stock was only incidental to its unsuccessful effort to prevent dissolution. An advantageous sale of its stock was not the reason for any of the expenditures until it became evident that a sale could not be prevented.

The expenditures were caused by the initiation by S.E.C. of the proceedings for the dissolution of American. Except for this, the expenses would not have been incurred. Since the proceedings in which the litigation expenses were incurred were initiated by S.E.C. and since their objective was the dissolution of American, which would have resulted in a loss by the taxpayer of its attractive investment in that company, we think the expenditures were a necessary expense of carrying on the taxpayer's business of conserving its holdings, and not for the primary purpose of realizing a capital gain. That a gain resulted from the contest was a consequence of the taxpayer's unsuccessful effort to hold onto its investment and of its being forced to sell, and does not alter the nature of the expenditures.

This is in line with the reasoning of the Tax Court in Allegheny Corp. v. Commissioner, 28 T.C. 298. The petitioner in that case was a closed-end investment company whose sole business was investments in, and management of its investments in, securities of other companies. Petitioner had a substantial holding of common stock of the Missouri Pacific Railroad Company. In 1933, Missouri Pacific was forced to place its property under the jurisdiction of the federal courts and the I.C.C. for reorganization under section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. Various plans of reorganization were proposed which would have wiped out petitioner's common stock interest, and it expended $541,113.64 in opposing such plans and seeking the adoption of a plan which would preserve its investment. A plan was finally adopted which gave recognition to the value of the common stock, and petitioner received new shares of common in exchange for the old. The original cost basis of the common was $31,032,312. The market value of the new stock acquired through the exchange was $9,256,500. The court's decision allowing the deduction of the expenses incurred by the petitioner was based upon the finding that the purpose of the expenditures was the protection of its investment.

We think that was the purpose in the case at bar.

The present case is unlike Towanda Textiles, Inc. v. United States, Ct.Cl., 180 F.Supp. 373. The taxpayer in that case, being in dissolution, came within the section providing that no gain or

loss should be recognized by such a corporation from sales of its property. During dissolution, one of the taxpayer's buildings was destroyed by fire. In order to collect the insurance on it, attorneys had to be employed. The insurance collected exceeded the base for the property, resulting in a non-recognizable capital gain. Since the purpose of the expenditure was the realization of this gain, we held that the expense of realizing it should be deducted from it. But here the realization of gain on the disposition of its stock in American was not the motivation for the expenditure, but, rather, opposition to the proposed requirement that it be disposed of, so long as there seemed to be any chance of obviating the necessity of disposing of it.

In Kornhauser v. United States, 276 U.S. 145, at page 153, 48 S.Ct. 219, at page 220, 72 L.Ed. 505, the Supreme Court said, that "where a suit or action against a taxpayer is directly connected with, or, as otherwise stated (Appeal of Backer, 1 B.T.A. 214, 216), proximately resulted from, his business, the expense incurred is a business expense within the meaning of § 214(a), subd. (1), of the act."

It seems to us that the expenses incurred in these proceedings "proximately resulted from * * * [the taxpayer's] business" of conserving its holdings in the stock of American and so "is a business expense within the meaning of" section 23 of the Internal Revenue Code of 1939, the successor of section 214(a) (1) of the Revenue Act of 1918, the section under consideration in Kornhauser.

The Kornhauser case was cited with approval by the Supreme Court in Trust of Bingham v. United States, 325 U.S. 365, 65 S.Ct. 1232, 89 L.Ed. 1670, wherein it was held that section 23(a) (2) providing for the deduction of expenses "for management, conservation, or maintenance of property held for the production of income", was in pari materia with section 23(a) (1), authorizing the deduction of trade or business expenses. The Court said at pp. 373–374, 65 S.Ct. at page 1236:

"* * * Such expenses need not relate directly to the production of income for the business. It is enough that the expense, if 'ordinary and necessary,' is directly connected with or proximately results from the conduct of the business. Kornhauser v. United States, supra, 276 U.S. 152–153 [48 S.Ct. 219, 220, 72 L.Ed. 505]; Commissioner v. Heininger, supra, [320 U.S.] 470–471 [64 S.Ct. 252, 88 L.Ed. 171]. The effect of § 23(a) (2) was to provide for a class of non-business deductions coextensive with the business deductions allowed by § 23(a) (1), except for the fact that, since they were not incurred in connection with a business, the section made it necessary that they be incurred for the production of income or in the management or conservation of property held for the production of income. McDonald v. Commissioner, supra, [323 U.S.] 61, 62, 66 [65 S.Ct. 96, 97, 98, 100, 89 L.Ed. 68]; and see H.Rep. No. 2333, 77th Cong.2d Sess., pp. 46, 74–76. S.Rep. No. 1631, 77th Cong.2d Sess., pp. 87–88."

The expenses there in question were attorney's fees in contesting an income tax deficiency. The court said they were incurred in the management and conservation of the estate and, so, were deductible.

See also Loyd v. United States, 153 F.Supp. 416, 139 Ct.Cl. 626.

We are of opinion that the expenses with which we are concerned were incurred in the management and conservation of the property plaintiff acquired in the course of carrying on its business. We think the expenses are deductible as an ordinary and necessary expense of doing business.

The second issue before us, which is completely unrelated to the first, concerns the disallowance by the Commissioner of a bad debt deduction which the

taxpayer took in 1946. The facts relating to this issue are stipulated also, supplemented by an affidavit.

American Coal Products Company, having later changed its name to the Barrett Company, became a wholly-owned subsidiary of taxpayer sometime prior to 1915. In 1915, the American Coal Products Company acquired $150,000 preferred stock and $150,000 First Mortgage 6 percent Bonds issued by Allegheny By-Product Coke Company. In December of that year, the bonds were refunded by an issue of Collateral Trust Notes, secured by First Refunding Mortgage 6 percent Bonds, which notes were replaced from time to time. The last issue of notes, dated April 1, 1921, consisted of 350 numbered notes, each containing a promise to pay the bearer on October 1, 1921, $1,000 with interest at the rate of 6 percent per annum from April 1, 1921, upon surrender of the one interest coupon attached to each note. The coupon read as follows:

"On the first day of October 1921, ALLEGHENY BY-PRODUCT COKE COMPANY will pay to bearer Thirty Dollars ($30.00) at the office of The Guardian Savings and Trust Company in the City of Cleveland, Ohio, in gold coin of the United States of America, being six months' interest then due on its Collateral Trust Six Per Cent Gold Note of April 1, 1921, unless said note shall have been previously redeemed."

American Coal Products Company received 150 of these notes in exchange for the bonds it held, and purchased seven more. Barrett also purchased two certificates evidencing interest in other notes of the same series. In 1922, Barrett transferred the notes and the two certificates to taxpayer.

In December 1946, taxpayer received a notice from the Mellon National Bank and Trust Company of Pittsburgh, successor trustee under the 1921 Collateral Trust Agreement, acknowledging taxpayer's ownership of these notes and certificates, and advising it that the remaining asset of Allegheny was $497.79. Upon surrender of the notes and certificates, the bank agreed to, and did, pay taxpayer its pro rata share of the $497.79, which amounted to $270.47.

In December 1946, Allegheny's preferred stock, notes, and certificates became worthless. Taxpayer sustained a $150,000 capital loss on the stock and an additional loss of $107,829.01 on the notes and certificates, for which latter loss taxpayer claimed a bad debt deduction for 1946, but which was disallowed by the Commissioner of Internal Revenue.

It is the Government's position that the loss must be treated as a capital loss by reason of section 23(k) (2) and (3) of the 1939 Code, which provides that, "If any securities (as defined in paragraph (3) of this subsection) become worthless within the taxable year and are capital assets, the loss resulting therefrom shall" be considered a capital loss. "Securities", as defined in section 23(k) (3), mean "bonds, debentures, notes, or certificates, or other evidences of indebtedness, issued by any corporation * * *, with interest coupons or in registered form." Thus, the Government contends that the statutory definition of "securities" applies to these notes in that "they were notes issued by a corporation, each of which bore one interest coupon." Taxpayer argues that because the notes bore only one coupon, and the statutory definition uses the plural form "coupons", the definition does not apply, and section 23(k) (1), allowing a deduction for debts which become worthless, is controlling.

We think, in view of the record as a whole, that these notes were "securities" within the meaning of section 23(k) (2) and (3) and, therefore, are deductible only as a capital loss.

Taxpayer says that, since section 23(k) (3) defines "securities" as "notes" etc., "with interest coupons", and since these notes had only one coupon attached, they do not come within the definition. We think they do. The

word "coupons" embraces many, a few, or only one coupon. The plural was used to embrace all notes with coupons attached, irrespective of how many coupons there might be. There is no indication it was intended to exclude a note with only one coupon. Since these notes matured in six months, they, of course, had only one coupon attached, but the stipulation does not explain why they were of such short maturity. It says they were "replaced" from time to time, but the last issue was on April 1, 1921. Apparently, from that time on they remained in default and were in default when they were transferred to the taxpayer in 1922.

However, the notes were secured by First Mortgage 6 percent Bonds and, hence, the holder of one of the notes had recourse to the bonds to collect his debt. What the terms of the bonds were, their maturity and their security, we do not know.

So, we have notes that do come within the words of the statute defining securities, and which were secured by First Mortgage 6 percent Bonds. On the meager facts presented, we cannot hold that the action of the Commissioner of Internal Revenue was in error in disallowing the deduction as a bad debt. The action of the Commissioner is, of course, presumptively correct.

Plaintiff is entitled to deduct as an ordinary and necessary business expense the attorneys' fees paid in 1945, 1946 and 1947 in the amounts stipulated. It is not entitled to deduct as a bad debt the notes that became worthless in 1946, but is entitled to treat them as a capital loss only. Plaintiff's and defendant's motions for summary judgment are allowed

in part and disallowed in part, as indicated above, and the case is remanded to the Trial Commissioner under Rule 38 (c), Rules of Court of Claims, 28 U.S. C. for a determination of the amount of recovery.

It is so ordered.

DURFEE, Judge; and LARAMORE, Judge, concur.

DAVIS, Judge (dissenting in part).

Because I read the record quite differently, I dissent from the holding that plaintiff is entitled to deduct as an ordinary and necessary business expense *all* the legal fees paid in 1945, 1946, and 1947. I agree with the court that, from the beginning of the S.E.C. proceedings through the first half of 1945, Allied was plainly seeking to conserve its stake in American and to keep that company from dissolution. But the situation changed, in my view, during the year 1945, after the S.E.C. issued its Memorandum Opinion of June 2, 1945, reiterating its conclusion that American was to be dissolved, but providing, also, that the preferred stock should be redeemed at a fair and equitable amount. At that point Allied accepted, essentially, the dissolution of American as settled, and directed its primary efforts to showing that the preferred had a value much higher than the par of $25 which it was at that stage assured of receiving. Although Allied continued to oppose dissolution in its presentation to the Commission in 1945 (and to some extent in 1946),[1] its briefs and memoranda to the S.E.C. (which are in the record before us) show that its chief concern was the highest possible valuation of the stock.[2] That certainly was its interest in 1947

1. The Commission again ruled on April 30, 1946, that American should be dissolved, 22 S.E.C. 704.

2. See, e. g., Allied's statements in its brief of December 8, 1945 (after the hearings in September 1945) that "the principal contention which will be made in this brief is that the treatment accorded by the plan to the preferred stock of American Light is unfair and inequita-

ble;" and its statement in its brief in support of its application for reimbursement of expenses that "So far as Allied was concerned, the principal question remaining [after the Commission's decision of June 2, 1945] for the hearings on Application 21 was the amount which should be awarded to the preferred stockholders for the termination of their interest in the enterprise."

when it changed its stance and demanded that American be dissolved.

My conclusion is that, contrary to the court's position, all the legal expenditures from 1940 to 1948 were not of the same nature. The earlier ones were undoubtedly for the primary end of preventing the dissolution of American but those made in the latter half of 1945, and in 1946 and 1947—the only years involved here—had the main purpose of increasing the sum which Allied would be paid for its preferred stock.

That crystallization of Allied's principal objective (during 1945–1947) brings our case, I believe, within the rule that legal fees (and like expenses) paid in an effort to increase the value of, and obtain a higher price for, a capital asset are not deductible as ordinary and necessary business expenses. Ward v. Commissioner, 224 F.2d 547 (C.A.9); Munson v. McGinnes, 283 F.2d 333 (C.A.3), cert. denied, 364 U.S. 880, 81 S.Ct. 171, 5 L.Ed.2d 103; Victoria Paper Mills Co. v. Commissioner, 32 B.T.A. 666, 667, affirmed, per curiam, 83 F.2d 1022 (C.A. 2).[3] This court's decision in Towanda Textiles, Inc. v. United States, Ct.Cl., 180 F.Supp. 373, is to the same effect; the ruling was that fees paid to attorneys to collect insurance on a burned building were not deductible as an ordinary and necessary expense. The Tax Court's opinion in Allegheny Corp. v. Commissioner, 28 T.C. 298, is not opposed. That taxpayer was fighting reorganization plans which would have entirely wiped out its common stock; its main interest was to preserve that investment from total destruction, not merely to increase the value of the shares on distribution (see 28 T.C. at 303–304).

In that connection it does not seem material in the present case that Allied paid $30 for its preferred stock while the par value (at which other parties to the S.E.C. proceedings wished to redeem the shares and which, by 1945, Allied was certain to receive at the minimum) amounted to only $25. Efforts to retrieve what one has paid for an asset, rather than to be forced to accept par, do not move the case out of the value-increasing class into the category of those dealing with the preservation and conservation of assets, such as Allegheny Corp., supra (in which total destruction of the investment was threatened). In Towanda Textiles, Inc., supra, it was not certain in advance that the insurance ultimately paid by the insurer would turn out to be more than the cost (or basis) of the property, but this court nevertheless held the attorneys fees which had been expended for obtaining the insurance proceeds not to be deductible as ordinary expenses.

On the view that Allied's expenditures for legal fees for 1945 (and perhaps for 1946) were divided between those concerned with preventing dissolution of American and those directed to increasing the value of the preferred stock on dissolution, this case should be sent to the Trial Commissioner, under Rule 38 (c), to make such an allocation and to determine the amount of recovery, if any, for 1945. If plaintiff can show by adequate proof that its legal expenses for 1946 included a substantial portion directed to preventing the dissolution of Allied (as distinguished from increasing the value of the preferred on distribution), and that a definite division of such expenditures can be had, a similar allocation should be made for that year. Plaintiff's claims for refunds premised on its expenditures for legal services in 1947 should be rejected outright. (On the other issue in the case I entirely agree with Judge Whitaker.)

JONES, Chief Judge, joins in the dissent.

3. The contrary holding in Heller v. Commissioner, 147 F.2d 376 (C.A. 9), cert. denied, 325 U.S. 868, 65 S.Ct. 1405, 89 L.Ed. 1987, turned on the effect of the then-prevailing rule in Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248. Naylor v. Commissioner, 203 F.2d 346, 347 (C.A. 5), seems to rest on the court's view that the attorneys fees were paid for *collection* of the proceeds of a prior sale of stock.