**ABKCO INDUSTRIES, INC., Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

**No. 72-1181.**

United States Court of Appeals, Third Circuit.

Argued Feb. 26, 1973.

Decided June 29, 1973.

As Amended Aug. 14, 1973.

Dissenting Opinion Aug. 21, 1973. See 486 F.2d 1371.

Leonard J. Schwartz, Selwyn A. Horvitz, Philadelphia, Pa., for appellant; Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., of counsel.

Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Elmer J. Kelsey, Bruce I. Kogan, Dept. of Justice, Tax Div., Washington, D. C., for appellee.

Before HASTIE and ALDISERT, Circuit Judges, and DITTER, District Judge.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

This appeal by an accrual basis taxpayer from an adverse decision of the United States Tax Court, 56 T.C. 1083, requires that we decide whether the court erred in disallowing as deductions for business expenses certain liabilities accrued but not actually paid during 1962 and 1963. The Tax Court sustained the contention of the Commissioner of Internal Revenue that certain accrued royalties due an artist under contract to a recording company were contingent liabilities for which no deduction was permissible.

ABKCO Industries, Inc., is engaged in the business of recording and selling phonograph records of the performances of a number of popular musical artists. In 1961, through a statutory merger, taxpayer succeeded to the business of Bernard Lowe Enterprises, Inc., and Parkway Records, Inc. As a result of this merger, taxpayer assumed the obligation of these companies to pay royalties to recording artist Ernest Evans, popularly known as "Chubby Checker," under a pre-existing contract between Evans and the merged corporations.

Appellant reported as income the sale price of all "records shipped less records returned," and accrued for purposes of deducting as cost of sales all royalties payable on "records shipped less records returned." During 1962 and 1963, the taxpayer deducted royalties payable to Evans in the amount of $433,712 and $187,065 respectively. Under the contract only $95,000 and $120,000 were actually paid to the artist during these years. The Commissioner disallowed taxpayer's deductions for royalties accrued in excess of the amounts actually

paid. His contention was sustained by the Tax Court.

Sections 446(a) and (c) of the Internal Revenue Code of 1954 authorize an accrual basis taxpayer to deduct an obligation in the taxable year in which all the events have occurred which are necessary to establish the fact of liability and the amount thereof with reasonable accuracy. See Treas.Reg. § 1.446–1(c) (1)(ii). The Commissioner and the Tax Court rely upon the settled principle that a taxpayer using the accrual method of accounting may not deduct any liability until the contingencies relating to such liability are removed. Security Mills Co. v. Commissioner, 321 U.S. 281, 284, 64 S.Ct. 596, 88 L.Ed. 725 (1944); Dixie Pine Co. v. Commissioner, 320 U.S. 516, 518–519, 64 S.Ct. 364, 88 L.Ed. 270 (1944); Lucas v. American Code Co., 280 U.S. 445, 449–451, 50 S.Ct. 202, 74 L.Ed. 538 (1930); American National Co. v. United States, 274 U.S. 99, 104–105, 47 S.Ct. 520, 71 L.Ed. 946 (1927); United States v. Anderson, 269 U.S. 422, 440–441, 46 S.Ct. 131, 70 L.Ed. 347 (1926); Lustman v. Commissioner, 322 F.2d 253, 258 (3d Cir. 1963); Noxon Chemical Products Co. v. Commissioner, 78 F.2d 871 (3d Cir. 1935). These cases hold that if all the events necessary to establish the fact of liability have not occurred, the liability is "contingent" and may not be accrued for purposes of deduction. The Commissioner argues that the accrued royalties deducted in this case fit into the classic mold of contingent liabilities. The taxpayer contends that all the events necessary to establish the fact of liability and the amount thereof with reasonable accuracy in fact occurred during the years in question.

The conflicting contentions of the Commissioner and the taxpayer result from divergent interpretations of the contract between taxpayer and Evans set forth in the margin.[1]

---

1. Under the contract Evans agreed to record a minimum of eight record "sides." In return, taxpayer agreed to the following terms:

5. For the rights herein granted and services to be rendered during the term of this agreement, we shall pay the following compensation so long as Artist is

performing his obligations under this agreement as of each payment date:

$90,000.00 per annum, at the rate of $7,500.00 per month, on the 28th day of each month, commencing January 28, 1962 and ending December 28, 1966,

making a total of $450,000.00.

The aforesaid payments shall be paid regardless of whether or not royalties computed under Paragraph 6 hereof equal such payments as of said payment dates. No portion thereof shall be refundable to us. After October 3, 1962, when Artist shall attain age twenty-one (21), payments shall be made directly to him.

6. In the event that Artist shall have fulfilled all his obligations under this Agreement until December 28, 1966, the expiration date hereof, and in the event that the royalties, as hereinafter computed for the entire term of this agreement [including royalties pursuant to Prior Agreements as per sub-paragraph (f) hereof], exceed the total of $450,000.00 paid as aforesaid, we shall pay to Artist on March 1, 1967, as additional compensation, such excess; otherwise no royalties shall be payable. However, in the event that royalties computable after December 28, 1966, when added to the said total as of December 28, 1966, exceed $450,000.00, then the excess shall be payable to Artist on each subsequent accounting, as provided in Paragraph 7 hereof. Said royalties shall be computed as follows:

(a). A royalty of five percent (5%) of the suggested retail list price per record (exclusive of all sales and excise taxes and duties, and less costs of containers and packaging not exceeding 50 cents per container or package), for ninety percent (90%) of all double-faced records manufactured hereunder and sold by us in the United States and paid for and not subject to return, on both faces of which are embodied any of the selections recorded hereunder, and one-half (½) of such royalty for ninety percent (90%) of all double-faced records manufactured hereunder and sold by us in all other countries and paid for, and not subject to return, on both faces of which are embodied any of the selections recorded hereunder; and one-half (½) of the respective amounts of such royalty for ninety percent (90%) of all records manufactured and sold by us on only one face of which

is embodied a selection recorded hereunder. * * *

* * * * *

(d). No royalties shall be payable on any professional copies or free records given or sent for sales promotion purposes, it being further understood, however, that such professional copies and free records, except as hereinafter provided in sub-paragraph (e), shall not exceed ten percent (10%) in quantity of the records manufactured and sold by us and upon ninety percent (90%) of which you receive the agreed royalties.

(e). With respect to records sold through any plan or device commonly referred to in the trade as a "record club," the royalties payable shall be equal to one-half (½) of the royalty otherwise payable hereunder, provided, however, that no royalty shall be payable with respect to records which are distributed to members of such record club either as a result of joining the club or as the result of the purchase of the required number of records, including records distributed as "bonus" and/or "free" records. However, such bonus or free records shall not exceed the number of records that are sold by the record club upon which royalties are paid by us pursuant hereto.

(f). Any royalties due under said Prior Agreements dated April 6, 1960 and April 27, 1961, for records released prior to the term of this agreement, shall be added to and calculated as part of the total royalties to be computed for the entire term of this agreement under Paragraph 6 hereof. No other payment shall be made upon said royalties other than as provided in Paragraph 6 hereof.

7. An accounting with respect to royalties computed pursuant to Paragraph 6 hereof shall be made by us to you and/or Artists semi-annually on the 1st day of May for records sold and paid for during the period ending the preceding February 28, and on the 1st day of November for the period ending the preceding August 31st in each year, and on March 1, 1967, for the period ending December 28, 1966. Similar accountings shall be made semi-annually after the expiration of the term of this agreement. The accounting on March 1, 1967, and the accountings thereafter shall be accompanied by payment of accrued royalties earned by Artist in excess of the $450,000.00 paid as set forth in Paragraph 5 hereof.

Without implying any substantive characterization to the forms of compensation provided by these contractual provisions, we will label, for the purpose of this discussion, the compensation provided in paragraph 5 as "monthly payments"; the compensation provided by paragraph 6, as "royalties"; and the amended figure of $575,000, as "aggregate of the monthly payments."

The taxpayer contends paragraph 6(a) should be read as establishing liabilities in the form of royalties at the rate of five percent of the suggested retail price per record on ninety percent of all records "paid for and not subject to return." [2] It urges us to view paragraph 5 as merely providing a method of payment by which the liabilities created by paragraph 6(a) may be discharged. In accord with this construction of the contract, the taxpayer views unlettered paragraph 6 as merely an accounting expedient by which taxpayer would be given credit for the monthly payments at the time specified in unlettered paragraph 6 and paragraph 7 for an accounting and payment of royalties. From this analysis of the contract, taxpayer concludes that all the events necessary to establish the fact of liability had occurred during the years in question. Stated differently, the taxpayer construes the contract as establishing a liability for royalties under paragraph 6(a) directly proportional to the number of records sold; and that only in the event that the sum of the monthly payments exceeded the liability for royalties would the taxpayer begin to accrue the monthly payments for purposes of deduction, for only then would these payments operate as a form of minimum compensation.

The Commissioner argues that it is paragraph 5 which establishes a form of compensation at the rate of $7,500 per month and, as amended, at the rate of $10,000 per month. He views the royalties as "additional compensation" payable March 1, 1967, only "[i]n the event

All royalty statements and all other accounts rendered by us to you and/or Artist shall be binding upon the Artist and you, and not subject to objection for any reason unless specific objection in writing, stating the basis thereof, is given to us within one (1) year from the date rendered. However, we shall have the right to take from the amount of royalties due any advance royalties previously paid.

On November 23, 1962, Evans and taxpayer executed an instrument ("Supplemental Agreement") amending the original letter agreement ("Principal Agreement"). Under the Supplemental Agreement, paragraph 5 of the Principal Agreement was amended to increase the total amount to be paid under that provision from $450,000 to $575,000 as follows:

1. Paragraph 5 of Principal Agreement is hereby amended to read as follows:

"For the rights herein granted and services to be rendered during the term of this Agreement, we shall pay the following compensation so long as Artist is performing his obligations under this Agreement as of each payment date: $95,000.00 for the annual period commencing on the date hereof and ending on December 28, 1962 in ten (10) consecutive monthly payments of $7,500.00 each commencing on January 28, 1962 and two (2) monthly payments of $10,000.00 each payable on November 28, 1962 and December 28, 1962 and thereafter for the balance of the term of this Agreement $120,000.00 per annum payable at the rate of $10,000.00 per month commencing on November 28, 1962 for a period of forty-eight (48) consecutive months making a total of $575,000.00.

\* \* \* \* \* \*

2. The amount of "$450,000.00" which appears in lines 6 and 11 of paragraph 6 and line 11 of paragraph 7 of Principal Agreement is hereby in each such three instances amended to read "$575,000.00."

2. Parallel arguments are made by the taxpayer with respect to paragraphs 6(d), (e) and (f), it being the contention of the taxpayer that these paragraphs likewise (1) establish royalties for records distributed through "record clubs," (2) exempt from royalty payments professionally distributed promotional records, and (3) control computation of royalties payable under pre-existing contracts. Paragraph 6(a) is economically the most significant provision and for sake of simplicity it alone is referred to in the text.

the Artist shall have fulfilled all his obligations under this Agreement until December 28, 1966, the expiration date hereof." He contends that this additional compensation is not payable until the liability for royalties exceeds the aggregate of the monthly payments. The Commissioner concludes, therefore, that royalties are a contingent liability which may not be accrued until the liability for royalties exceeds the aggregate of the monthly payments.

It should be observed that the Commissioner recognizes the then existing possibility that record sales could decline and no royalties would be payable as additional compensation. In that event, the monthly compensation alone would have been payable. So construed, the accrued liability for royalties was indeed contingent.

The taxpayer counters this analysis by emphasizing that the royalties computed under paragraph 6 were at all times substantially in excess of the compensation made in the form of monthly payments. Alternatively, the taxpayer suggests that in the event of a sudden decrease in sales, initially the liability for royalties would be discharged via the monthly payments. Finally, addressing itself to the realities of this contract, taxpayer points to the increase of the monthly payments and the aggregate of those payments from $7,500 per month and $450,000, to $10,000 per month and $575,000. Taxpayer contends that this modification is indicative of the realization of the parties that the monthly payments would have to be increased in order to discharge the liability for royalties which were accruing more rapidly than anticipated.

The Tax Court construed the contract in accord with the view of the Commissioner. The court ruled that no royalties were payable until the liability for royalties exceeded the aggregate of the monthly payments, making the aggregate in effect a $575,000 guaranteed compensation. So construing the contract, the court disallowed royalties accrued in 1962 in excess of the sum of the monthly payments made in that year because by December 31, 1962, the liability for accrued royalties was still $123,000 below the $575,000 aggregate. The same treatment was accorded that portion of the royalties accrued in 1963 which did not raise total accrued royalties above the $575,000 minimum. That portion of the royalties accrued in 1963 which did exceed the $575,000 figure amounted to $64,000. The Tax Court disallowed deductions of this excess, stating that it too was a contingent liability for two reasons. First, under the contract, royalties were payable only on "records paid for and not subject to return," but were accrued on the basis of "records shipped less records returned." To the extent that "records shipped less records returned" might not be paid for or subsequently might be returned, the taxpayer had overstated its liability. Second, returns of Evans' records in subsequent years required the taxpayer to include as income some $113,000 of previously accrued royalty deductions, an occurrence which indicates the contingent nature of this $64,000 excess at the time it was accrued.

Both the position of the taxpayer and that of the Commissioner present reasonable interpretations of a complex legal document. Were we called upon to interpret this contract as a court of first instance, we cannot say that we would not agree with the position advocated by the taxpayer. However, we approach resolution of this issue, not as a trial court, but fully aware of our role as an appellate tribunal.

█ Although there is room for disagreement, we are persuaded that the determination of whether the events necessary to establish the fact of liability have occurred is more a question of law than a finding of fact. If the latter, we would have no hesitation in affirming the Tax Court under the clearly erroneous rule. See Krasnov v. Dinan, 465 F. 2d 1298 (3d Cir. 1972). We are constrained, however, to view the problem as one sounding in law rather than in fact.

■ We have previously held that interpretation and construction of a contract is a question of law and that the interpretation by the Tax Court is reviewable by this court. Welsbach Engineering & Management Corp. v. Commissioner, 140 F.2d 584, 586 (3d Cir.), cert. denied, 322 U.S. 751, 64 S.Ct. 1261, 88 L.Ed. 1581 (1944). In addressing itself to this issue, in Union Planters National Bank v. United States, 426 F.2d 115, 117 (6th Cir.), cert. denied, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970), the Court of Appeals for the Sixth Circuit stated:

> The intent of the parties [to the contract] may be important in determining just what their contractual relations *inter sese* were, but there is little dispute here about what obligations and rights the parties expected their agreement to confer. This case hinges, rather, on the legal characterization, for federal income tax purposes, of the transactions between the parties [to the contract]. That characterization is not a question of fact, but rather one of law. Cf. Cordovan Associates, Inc. v. Dayton Rubber Co., 290 F.2d 858 (6th Cir. 1961).

We conclude, therefore, that the determination of the tax consequences of this contract presents a legal issue fully reviewable by this court.

■ This is not to say, however, that we should approach the determination of this question unmindful of the expertise of the Tax Court in application of the tax laws. In considering the scope of appellate review of the determinations of the Tax Court, the Supreme Court instructs us: "In deciding law questions courts may properly attach weight to the decisions of points of law by an administrative body having special competence to deal with the subject matter." Dobson v. Commissioner, 320 U.S. 489, 502, 64 S.Ct. 239, 247, 88 L.Ed. 248 (1943). The Court clearly indicated that the Tax Court is such an expert administrative body and suggested that for the sake of uniformity the Tax Court's resolutions of legal issues should be followed wherever possible. Thus, while recognizing that the "appellate courts have always had the unqualified power to review and reverse decisions of law by the Tax Court," 9 Mertens, Law of Federal Income Taxation, § 51.25, we also must recognize that the Tax Court's resolutions of questions of law are persuasive and that it is desirable for the reviewing court to have the benefit of the Tax Court's expertise in these matters.[3]

---

3. Historically, appellate review of determinations of the Tax Court has been the subject of an evolutionary process. At one time, the findings of the Tax Court were merely "prima facie evidence" of the facts found. Revenue Act of 1924, § 900 (g), 43 Stat. 253, 336. Congress greatly limited the broad scope of review permitted by this rule when it enacted the Revenue Act of 1926, § 1003(b), 44 Stat. 9, 110, under which appellate review of decisions of the Tax Court was limited to "questions of law." Interpreting the effect of the 1926 Act upon appellate review of the factual determinations of the Tax Court, the Supreme Court indicated such determinations were not subject to review if they were found to have "warrant in the record" and "a reasonable basis in the law." *Dobson, supra,* 320 U.S. at 501, 64 S.Ct. at 246. The decision required affirmance of Tax Court determinations of mixed questions of fact and law if the elements of the determination could not be separated on appeal so as to reveal a "clear-cut mistake of law." 320 U.S. at 502, 64 S.Ct. 239. Congress interpreted *Dobson* as rendering unreviewable Tax Court determinations of questions of fact supported by any evidence in the record. Sen.Rep.No.1559, 80th Cong., 2d Sess. (1948). Believing this interpretation of the Revenue Act of 1926 placed too narrow a limitation upon appellate review of Tax Court determinations, the Congress enacted section 1141(a) of the Internal Revenue Code of 1939, P.L. 773, § 36, 80th Cong., 2d Sess., which is presently codified as 26 U.S.C. § 7482(a). This statute placed review of Tax Court determinations by the courts of appeals on the same footing as appellate review of the decisions of the United States district courts in non-jury civil cases. We have interpreted the statute as making Federal Rule of Civil Procedure 52(a) applicable to appeals from decisions of the Tax Court so that findings of fact by the Tax Court may not be disturbed unless clearly erroneous.

Hormel v. Helvering, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1941). See Bradley v. Commissioner, 324 F.2d 610, 612 (4th Cir. 1963).

■■ Strictly speaking, it may not be proper to refer to "burden of proof" in reference to the resolution of a question of law. However, it would appear that an appellate court should not reverse the Tax Court's construction of a contract where no more has been shown than that the construction urged by the taxpayer is as reasonable as that adopted by the Commissioner and sustained by the Tax Court. More than mere equivalency must be shown by the taxpayer, for notwithstanding the reasonableness of a proffered construction, the taxpayer must show that the construction supporting the Tax Court's deficiency determination is incorrect. We find that the taxpayer did not make such a showing here.

The decision of the Tax Court will be affirmed.

DITTER, District Judge, dissents.

HASTIE, Circuit Judge (concurring).

I concur, although to me the technical problem presented is somewhat simpler than Judge Aldisert's opinion indicates. In summary, my analysis is this.

The language of the several interrelated provisions of the contract between the taxpayer and the recording artist is apt to convey the meaning that the Commissioner and the Tax Court have attributed to it. On the other hand, to support its conclusion that, for tax deduction purposes during the taxable years, certain royalty obligations were no longer "contingent," the taxpayer has had to labor to extract from a formal writing meaning that its terms do not readily convey. Therefore, as a matter

Commissioner v. Penn Athletic Club Bldg., 176 F.2d 939, 943 (3d Cir. 1949).

While the standard of review of factual determinations of the Tax Court has changed markedly over the years, review of questions of law has not fluctuated in the same manner. Although 26

of law, the taxpayer's interpretation of the contract cannot properly prevail in a judicial tribunal, whether in a court of first instance or on appeal.

Once the Tax Court's construction of the contract is accepted as legally correct, the undisputed facts clearly establish, as Judge Aldisert's opinion shows, that the items deducted by the taxpayer as fixed accrued liabilities of the taxable years were only contingent obligations of undeterminable amount until some subsequent time.

U.S.C. § 7482(a) had as its express purpose the modification of *Dobson* with respect to review of findings of fact by the Tax Court, the statute does not profess to affect that portion of *Dobson* which discusses appellate review of questions of law.